UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Liberty Mutual Insurance Company,

       Plaintiff,

Case No. 11-13605

Honorable Nancy G. Edmunds

v.

City of Dearborn,

       Defendant.

_____/

**OPINION AND ORDER DENYING LIBERTY MUTUAL'S MOTION FOR SUMMARY JUDGMENT [54] AND GRANTING IN PART AND DENYING IN PART CITY OF DEARBORN'S MOTION FOR SUMMARY JUDGMENT [41]**

In 2004, the City of Dearborn entered into a contract with non-party Posen Construction, Inc., to construct part of Dearborn's combined sewer overflow (CSO) project. Liberty Mutual Insurance, Co., issued a performance bond for the work that the contract required.

The contract, Contract 2, required Posen to construct a caisson, a large cylindrical container that collected and treated waste water runoff. The engineering firm Neyer, Tiseo & Hindo, Ltd. (NTH), designed the caisson for Dearborn and acted as the engineer for the entire CSO project. Almost from the outset, problems surrounded the caisson's construction. In December, 2006, the caisson had an in-flow of water that allegedly prohibited any major progress on the caisson. In 2009, Posen filed suit in state court seeking money damages, additional time to complete the contract, and other relief. Posen and Dearborn disputed the cause of the problems. In late 2010, Posen and Dearborn

accepted a case evaluation award. Dearborn paid Posen $600,000.00. Despite resolving the Posen litigation, Posen did not return to work on the caisson.

In 2011, with very little progress having been made on the caisson, Dearborn "declared" a default under the performance bond and notified Liberty that it was declaring a contractor default.

Following the declaration of default, Liberty filed suit seeking a declaratory judgment that it is not liable under the performance bond. (Dkt. 3, Am. Compl.) Liberty alleges seven counts in its amended complaint as to why it is not liable for a breach of the policy: discharge by impairment; discharge by modification; contractual period of limitations; waiver of right to terminate; abandonment of contract; and impossibility of performance. (*Id.*)

On October 14, 2011, Dearborn filed its amended counterclaim. (Dkt. 11, Am. Countercl.) With its amended counterclaim, Dearborn seeks a declaratory judgment that Liberty is liable under the performance bond and that Liberty must (1) perform the remaining work on Contract 2 (either by itself, its agents, or an independent contractor), or (2) pay Dearborn the amount required to complete Contract 2. (*Id.* at 8.) Dearborn also asserts counts for breach of contract and unfair trade practices act violations. (*Id.* at 9-10.)

Dearborn has filed a motion for summary judgment on Liberty's claims. (Dkt. 41.) Liberty has filed a motion for summary judgment on Dearborn's counterclaim. (Dkt. 54.)

The Court addresses Liberty's motion first, for Liberty argues that the doctrines of res judicata and/or issue/claim preclusion or the performance bond's contractual period of limitations bar Dearborn's suit. If Liberty were to succeed on these claims, Dearborn's motion would be moot. Because the Court finds, though, that res judicata does not bar this

2

suit and disputed issues of fact exist as to when the performance bond's contractual period of limitations began to toll, the Court DENIES Liberty's motion for summary judgment.

The Court therefore addresses Dearborn's motion for summary judgment. Dearborn requests a declaratory judgment that Liberty owes on the bond. Dearborn also substantively attacks Liberty's arguments as to why Liberty does not owe on the performance bond. The Court GRANTS in PART and DENIES in PART Dearborn's motions. The Court DENIES Dearborn's request for a declaratory judgment because the Court finds that, viewing the facts in a light most favorable to Liberty, genuine issues of fact exist as to whether Liberty can assert that the performance bond should be discharged by impairment, modification, and/or abandonment. As to the waiver argument, the Court DENIES Dearborn's motion for summary judgment, for the Court finds that the waiver argument parallels the abandonment argument. As to the impossibility argument, the Court GRANTS Dearborn's motion, because the Court finds that there is uncontested evidence that a contractor could complete the caisson as contemplated by Contract 2 and because Liberty's arguments are not well-supported. The Court finally DENIES Dearborn's motion as to damages because issues of fact exist as to what damages, if any, Dearborn would be entitled.

I.   **Facts**

   **A. Dearborn's Combined Sewer Overflow Basis of Design; Dearborn awards Contract 2 to Posen, Liberty issues a performance bond for Contract 2**

In 1999, Dearborn retained Neyer, Tiseo & Hindo, Ltd. (NTH), to prepare a basis of design (BOD) for a combined sewer overflow (CSO) project so that the city's storm water and water system would comply with federal and state discharge standards. (Dearborn's

3

Mot. for Summ. J. at 2.)  NTH submitted a BOD on Dearborn's behalf.  (*Id.*) NTH was the engineer and Dearborn's representative on the CSO project.  (Liberty's Mot. for Summ. J. at 2, Ex. A, Dearborn-Posen Contract at 1.)  The Michigan Department of Environmental Quality (MDEQ) issued the required National Pollutant Discharge Elimination (NPDES) permit to construct the CSO project.  (Dearborn's Mot. at 1.)  In accordance with the BOD, the CSO project would have presumptively met water quality standards.

Dearborn divided the BOD for the CSO into several contracts.  Dearborn bid out Contract 2, and awarded the contract to Posen Construction, Inc.  (Dearborn's Mot. at 3.)  Contract 2 called for the construction of large, 116 feet in diameter, "capture shaft"/caisson, that would contain and "in some instances treat[] wastewater that would have otherwise overflowed into the Rouge River."  (*Id.* at 1; Liberty's Mot. for Summ. J. at 2.)

On November, 2004, Posen and Dearborn finalized Contract 2.  (Dearborn-Posen Contract at 7.)  Contract 2 listed several benchmark completion dates.  (*Id.* at 1.)  By April 1, 2007, Posen was to have substantially completed the caisson.  (*Id.*)  By May 1, 2007, Posen was to have completed the caisson.  (*Id.*)

On October 26, 2004, Posen, Dearborn, and Liberty entered into the performance bond.  (Am. Compl., Ex. A, Performance Bond.)  The performance bond's amount was for $28,895,048.00.  (*Id.*)

Liberty became liable under the performance bond, so long as Dearborn was not in default, when

> [Dearborn] has notified [Posen] and [Liberty] . . . that [Dearborn] is
> considering declaring a Contractor Default and has requested and attempted
> to arrange a conference with [Posen] and [Liberty] to be held not later than
> 15 days after receipt of such notice to discuss methods of performing the
> Contract. If [Dearborn], [Posen] and [Liberty] agree, [Liberty] shall be allowed

4

a reasonable time to perform the Contract, but such an agreement shall not waive [Dearborn's] right, if any, subsequently to declare a Contractor Default[.]

(Performance Bond, ¶ 3.1.)  Liberty would also be liable under the performance bond when

[Dearborn] has declared a Contractor Default and formally terminated [Posen's] right to complete the Contract.  Such Contractor Default shall not be declared earlier than 20 days after [Posen] and [Liberty] have received notice as provided in Paragraph 3.1[.]

(*Id.* ¶ 3.2.)  To recover under Paragraph 3, Dearborn also had to first pay the remainder of

the contract's price to Liberty or another contractor.  (*Id.* ¶ 3.3.)

Paragraph 4 lays out Liberty's duties when Dearborn satisfies Paragraph 3.

(Performance Bond, ¶ 4.)  Paragraph 4:

When [Dearborn] has satisfied the conditions of Paragraph 3, [Liberty] shall promptly and at [Liberty's] expense take one of the following actions:

4.1.  Arrange for [Posen,] with Consent of [Dearborn,] to perform and complete the Contract; or

4.2.  Undertake to perform and complete the Contract itself, through its agents or through independent contractors; or

4.3.  Obtain bids or negotiated proposals from qualified contractors acceptable to [Dearborn] for a contract for performance and completion of the Contract, arrange for a contract to be prepared for execution by [Dearborn] and Contractor selected with [Dearborn's concurrence], to be secured with performance and payment bonds executed by a qualified surety equivalent to the bonds issued on the Contract, and pay to [Dearborn] the amount of damages as described in Paragraph 6 in excess of the Balance or the Contract Price incurred by [Dearborn] resulting from [Posen's] Default; or

4.4.  Waive its right to perform and complete, arrange for completion, or obtain a new contractor and with reasonable promptness under the circumstances:

1.  After investigation, determine the amount for which it may be liable to [Dearborn] and, as soon as practicable after the amount is determined, tender payment therefor to [Dearborn]; or

2.  Deny liability in whole or in part and notify [Dearborn] citing reasons therefor.

5.  If [Liberty] does not proceed as provided in Paragraph 4 with reasonable promptness, [Liberty] shall be deemed to be in default on this Bond 15 days after receipt of an additional written notice from [Dearborn] to [Liberty] demanding that [Liberty] perform its obligations under this Bond, and [Dearborn] shall be entitled to enforce any remedy available to [Dearborn.] If [Liberty] proceeds as provided in Paragraph 4.4, and [Dearborn] refuses the payment tendered or [Liberty] has denied liability, in whole or in part, without further notice [Dearborn] shall be entitled to enforce any remedy available to [Dearborn.]

Contract 2 defines "contractor default" and "owner default":

Contractor Default: Failure of [Posen], which has neither been remedied nor waived, to perform or otherwise to comply with the terms of the Contract.

(Performance Bond ¶ 12.3.)

Owner Default: Failure of [Dearborn,] which has neither been remedied nor waived, to pay [Posen] as required by the Contract or to perform and complete or comply with the other terms thereof.

(Performance Bond ¶ 12.4.)

The performance bond requires any suit under the bond to "be instituted within two years after Contractor Default or within two years after Contractor ceased working or within two years after Surety refuses or fails to performs its obligations under this Bond, whichever occurs first."  (Performance Bond ¶ 9.)

**B.  Posen begins construction on Contract 2's caisson, the parties experience problems sinking the caisson, Dearborn and Posen sign a change order in 2008, Dearborn and Liberty's offered views why the caisson construction experienced problems**

In September, 2004, Posen began constructing the caisson.  (Dearborn's Mot., Ex. 1, September 24, 2010 Contract 2 Independent Engineering Assessment of Caisson Construction Issues).

Dearborn explains what the caisson is and states that Posen was supposed to use a specific means to sink the caisson:

6

> Described in basic terms, the [c]aisson is a massive underground, concrete cylinder designed to capture excess storm and sewer water. The [c]aisson was to be constructed using the "sinking caisson" method. Pursuant to this method, the [c]aisson is sunk into the ground using its own weight as the driving force, combined with the contractor reducing or eliminating the three forces that resist against the [c]aisson sinking (*i.e.*, frictional resistance on the outside and inside faces of the [c]aisson caused by the soil in contact with the [c]aisson, and the end bearing resistence of the soil under the bottom portion of the [c]aisson). Under this method of construction, the [c]aisson is constructed in stages. Consecutive rings of concrete comprising the [c]aisson are poured and the weight of the [c]aisson (combined with the reduction of resistant forces) drives it into the ground. After the [c]aisson has sunk to an appropriate depth, a new ring (or "lift") is added and the process of sinking begins again. This process is repeated until the [c]aisson reaches its intended depth, which in this case was bedrock.

(Dearborn's Mot. at 3, n. 3.)

Dearborn explains that, while it permitted Posen much leeway in the caisson construction, Contract 2 mandated Posen to sink the caisson "in the wet," meaning that, once the caisson reached a specific depth, "it must [have been] allowed to fill with the water that naturally occurred in the ground." (Dearborn's Mot. at 3.) Dearborn further explains that the "purpose of this head of water was to mitigate against the soil 'piping' from the exterior of the [c]aisson under the bottom of the [c]aisson and into the interior of the [c]aisson." (*Id.* at 3-4.)

The caisson construction did not go as planned. (Dearborn's Mot., Ex. 1, September 24, 2010 Contract 2 Independent Engineering Assessment of Caisson Construction Issues; Liberty's Mot. at 4.) The caisson experienced several in-flows, or "blow-ins," of soil and water in 2006, including a major blow-in in December, 2006, "after the caisson was seated on rock, but prior to the start of caisson underpinning operations and rock excavation within the shaft." (*Id.* at 1; *Id.* at 4.) After the December 2006 blow-in, "the caisson was flooded to prevent further ground loss into the shaft." (*Id.*; *Id.*)

7

Liberty and Dearborn dispute the reasons why the caisson construction experienced problems.

Dearborn alleges that Posen deviated from the original plans by attempting to sink the caisson "in the dry." (Dearborn Mot. at 4.)  Dearborn further alleges that NTH never ratified Posen's altered plan and that NTH reserved the right to require Posen to sink the caisson with the required head of water if NTH deemed that process necessary. (*Id.* Exs. 4, 5.) Dearborn claims that Posen "repeatedly ignored NTH's warning, admonitions, and instructions regarding increasing the level of water in the [c]aisson when warning signs of ground-loss manifested." (*Id.*, Exs. 6, 7, 8.)  Dearborn states that Posen's failure to follow NTH's recommendations and warnings resulted in the blow-ins and significant damage to the infrastructure.  (*Id.*)

Dearborn states that, when Posen followed the contract and wet-sank the caisson, the caisson finally reached bedrock, as the contract required.  (Dearborn's Mot. at 4.)  After reaching bedrock, Dearborn says that the contract required Posen to remove bedrock underneath the caisson to increase the storage capacity.  (*Id.*)  Dearborn states that the contract required Posen to stabilize the soil around the caisson and to choose the means by which to stabilize the soil.  (*Id.* at 4, 5, Ex. 9.)  Dearborn maintains that Posen chose jet grouting, and experienced many problems with the jet grouting, which led to the December 2006 blow-in.  (*Id.* at 5.)

After the December 2006 blow-in, Dearborn states that it, Posen, and NTH engaged in discussions and workshops about how to continue the caisson construction.  (Dearborn Mot. at 6.)  Dearborn maintains that the discussions resulted in Change Order No. 6, and Dearborn advancing Posen roughly $2,000,000.00 to continue dewatering of the caisson.

8

(*Id.*, Ex. 10, Change Order No. 6.) The parties executed Change Order No. 6 on June 13, 2008. Dearborn states that Posen did not dewater the caisson to the point where it believed it could continue work on the caisson. (*Id.*, citing Ex. 11, Posen's monthly progress payments indicating work conducted through September 15, 2008.) Dearborn explains that, in late 2008, Posen ceased worked on the dewatering project and that Posen did not undertake any significant work on the caisson. (*Id.*)

Liberty characterizes the events that surround the caisson differently. (Liberty's Resp. at 3.) Liberty maintains that Dearborn and NTH's caisson designs caused the blow-ins and the suspended work. (*Id.* at 3-4.)

Liberty first points to their geotechnical consultant's report. (Liberty's Resp. at 3-4.) Ronald E. Heuer, a geotechnical consultant, conducted a study, made findings, and issued a report as to the causes of the blow-ins. (Liberty's Resp., Ex. A, Heuer October 26, 2007 interpretation of blow-ins report.) Heuer concluded that the cause of the blow-ins was the "incomplete sealing of the upper bedrock by the methods specified in [] Contract [2]." (*Id.*) Heuer continued, "[t]he fundamental underlying cause behind all of the factors is that, for the detailed geologic conditions actually present at this site, the basic Contract design and specifications did not ensure a complete seal of the lower soil, the soil/rock contract, and particularly the upper fractured bedrock." (*Id.*) In his report, Heuer counters Dearborn's various arguments as to why Posen was at fault for the blow-ins. (*Id.*)

Heuer also issued a report in September, 2010. (Liberty's Resp., Ex. A, Heuer September 21, 2010 interpretation of blow-ins report.) In this report, he confirmed his belief as to the cause of the blow-ins. (*Id.*) He characterized the cause as a "mismatch" "because the actual geologic conditions encountered were different from the conditions

9

[NTH] had interpreted from [Contract 2] boring data and had expected based upon local experience[.]"  (*Id.*)  He further characterized the problems encountered as a differing site condition.  (*Id.*)

Liberty next disagrees with Dearborn's statement that Dearborn/NTH did not approve of sinking the caisson "in the dry" and that sinking in the dry was not successful.  (Liberty's Resp. at 4.)  Liberty does show that NTH knew of Posen's sinking the caisson in the dry. Gilbert testified that NTH did not sink the caisson in the wet.  (Liberty's Mot., Ex. D, Larry Gilbert Dep. at 61.)  He stated,

> Posen envisioned and actually proceeded with an alternative method that involved construction of a cutoff wall that isolated the interior of the caisson construction, or the caisson itself from the surrounding soil and water in the soil, that they believed would allow them to de-water the interior of the caisson, dry conditions, and proceed with construction without the balancing head of water with this surrounding cutoff wall providing the protection for their excavation.

(Ex. D, Larry Gilbert Dep. at 62.)

Liberty asserts that Posen successfully sank the caisson "in the dry," but the language cited that Liberty argues supports that assertion does not support that position.  (Liberty's Resp. at 4, citing Liberty's Mot., Ex. O, Murray Dep. at 14, in which Murray states that the caisson reached bedrock, but in which Murray does not state by which method the caisson reached bedrock.).

Liberty also contests Dearborn's characterization of the events surrounding the dewatering and Change Order No. 6.  (Liberty's Resp. at 5-6.)  Liberty states that the dewatering and the change order did not serve the sole purpose of advancing the project. (*Id.* at 5.)  Liberty suggests that Change Order No. 6 served also to substantiate Posen's

position regarding the cause of the blow-ins and to determine whether different site conditions existed. (Liberty's Resp. at 5, Liberty's Mot., Ex. J, Murray Dep. at 73, 53.)

Liberty maintains that Change Order No. 6 "was not a magnanimous gesture reflecting compromise and commitment to completing the Project[.]" (Liberty's Resp. at 5.) Liberty explains that, if Posen's claims turned out to be valid, the two million dollars would be added to Contract 2, but if the claims were not valid, then Dearborn would take the two million from Posen's retainer. (*Id.* at 5-6, Liberty's Mot., Ex. J., Murray Dep. at 43-44.)

Liberty also states that the parties disputed how much dewatering of the caisson was necessary to continue work on the caisson. (Liberty Resp. at 6, Liberty's Mot., Ex. J, Murray Dep. at 54.)

And finally, relating to the dewatering, Liberty offers that Posen raised safety concerns related to the dewatering–that Posen refused to continue dewatering because it believed more dewatering without additional wells would put its employees at risk. (Liberty's Resp., Ex. B, Zapczynski Aff. ¶ 3.)

### C. Posen files suit against Dearborn to resolve issues surrounding Contract 2

In February, 2009, Posen filed suit against Dearborn in Michigan state court. (Dearborn's Mot. for Summ. J., Ex. 12, Posen Compl.) In its complaint, Posen stated that its suit arose of out the Contract 2 project and that Posen sought "to remedy acts/omissions by [Dearborn] that require adjustments of Contract Price/Time and/or constitute breaches of [Dearborn's] contract with Posen." (Posen Compl. ¶ 6.) Posen added that it filed suit because of "additional contract costs/damages suffered by Posen as a result of the changed work on the Project including, but not limited to, numerous changes ordered by [Dearborn] to perform additional work; [Dearborn's] issuance of defective/erroneous plans,

11

specifications, drawings, geotechnical and design information; differing site conditions; as well as [Dearborn causing] suspensions and delays to the Project Schedule."  (*Id.*)

In that complaint, Posen stated, "[t]o date and throughout the course of the Project work (which is still ongoing) Posen has encountered excusable delays caused by or attributable to [Dearborn.]" (Posen Compl. ¶ 17.)  "Based only on delays experienced through January 2009, Posen is entitled under the Contract to a time extension well in excess of 1000 calendar days."  (*Id.* ¶ 17.)  Posen alleged that it could not determine an accurate Contract 2 completion date due to the allegedly excusable delay that Dearborn caused.  (*Id.*)  Posen also alleged that "[a]s a direct result of [Dearborn's] actions and inactions, the nature and extent of performance required of Posen has been radically different than contemplated by the Parties at the time of contracting."  (*Id.* ¶ 18.)

Posen alleged breach of contract, breach of contract–warranty specifications, breach of contract–differing site conditions, breach of contract–delay, and quantum meruit.  Posen sought money damages, "[a]dditional relief to which Posen is entitled under the Contract, including but not limited to an extension of the Contract Time," and other relief.  (Posen Compl. at 25.)

In April, 2009, Dearborn filed a third-party complaint against NTH in the Posen Litigation.  (Liberty's Mot., Ex. L, NTH Compl.)  In the third-party complaint, Dearborn acknowledged the Posen complaint and the allegations against Dearborn.  Dearborn alleged that it filed its complaint against NTH alleging that if Dearborn was liable to Posen, then NTH would be liable to Dearborn for the alleged design errors or inaccuracies. (NTH Compl. ¶ 16.)

12

### D.  The engineering firm CDM becomes involved, Dearborn moves forward with the intent to have CDM replace NTH, CDM prepares a revised BOD

In December, 2008, Murray, Dearborn's representative who was in charge of the CSO project, reached out to Carl Johnson, an engineer with the engineering firm CDM Smith. (Liberty's Resp., Ex. H, Carl Johnson Dep. at 13-14.)  Johnson stated that Murray had been frustrated with the CSO project and sought Johnson's advice.  (*Id*. at 14.)   In the summer of 2009, the engineering firm, CDM, became involved with the CSO project generally, and the Contract 2 caisson specifically.  (*Id*. at 8.)   Johnston stated that Dearborn sent out a request for proposals (RFP) seeking architectural design and analysis services dealing with the CSO project.  (*Id*. at 23.)  Johnson explained that CDM's objective in responding to the RFP was to help Dearborn deal with a looming MDEQ/NPDES permit deadline by looking at the CSO's current BOD.  (*Id*. at 24.)   Johnson stated that Dearborn was looking whether there could be a revised BOD for the CSO.  (*Id*. at 25.)   Johnson stated that CDM submitted its proposal on June 10, 2009; he added that Dearborn chose CDM's proposal on June 23, 2009.  (*Id*. at 27-28.)

The proposal that CDM submitted, and Dearborn chose, took a "demonstrative approach" to resolving/finishing the CSO project.  (Johnson Dep. at 34.)   Johnson explained that CDM suggested that Dearborn construct the CSO project, and Contract 2's caisson, to a smaller volume than the original BOD called for.  (*Id*.)  Given that CDM proposed that the CSO project have a smaller volume, and therefore a smaller facility, in order to comply with MDEQ water quality standards and receive a NPDES permit, Dearborn would have to 'demonstrate,' or prove, that the new design would result in the

13

proper water quality standards.  (*Id.*)  CDM performed the study specifically on three caissons, 2, 3, and 5.  (*Id.* at 35.)

Johnson testified that CDM submitted a revised BOD based on this demonstrative approach and that Dearborn ultimately introduced this revised BOD to MDEQ.  (Johnson Dep. at 36.)  Johnson stated that, in July, 2009, before the revised BOD, CDM met with Dearborn and MDEQ and with NTH to discuss a reevaluation of the current BOD.  (*Id.* at 44.)  Johnson stated that CDM suggested various alternatives to the current BOD–sewer separation, retention treatment basins, and a possible hybrid between the presumptive approach (the current BOD) and the demonstrative approach.  (*Id.* at 45.)

Concerning Contract 2's caisson, Johnson explained that CDM looked at three alternatives.  (Johnson Dep. at 45.)  The first alternative was to dewater and finish the caisson as originally contemplated.  (*Id.*)  The second was, if MDEQ approved of the reduced capacity caisson, to shorten the caisson's shaft and install a tremie concrete plug without dewatering the site.  (*Id.* at 46.)  And the third option was to coordinate Contract 3's caisson's discharge with Contract 2's caisson.  (*Id.*)

Johnson stated that the second alternative "became acceptable to MDEQ."  (Johnson Dep. at 48, 60.)  Johnson explained that CDM, MDEQ, and Dearborn met several times in the fall of 2009 regarding the best way to deal with the current problems surrounding the caisson and how to move ahead.  CDM then prepared a revised BOD to submit to MDEQ in order to secure a new NDPES permit.  (*Id.* at 69.)  The revised BOD suggested that Dearborn proceed with the caisson in accordance with the second alternative–finishing the caisson at its current depth and constructing a tremie slab.  (*Id.* at 84.)

14

Despite continued design specification discussion throughout the end of 2009 and beginning of 2010, and continual discussions about possible completion dates, and discussions about handing off the project from NTH to CDM, Johnson testified that Murray never gave CDM notice to move forward on the revised BOD, save for "some very minor things." (Johnson Dep. at 105.)  Johnston also testified that Murray never enacted the discussed handoff of duties from NTH to CDM.  (*Id.* at 108.)  Johnson reiterated that Dearborn did not tell CDM to proceed on Contract 2, save for minor things; one of the minor things Dearborn asked CDM to do was to investigate how to construct the tremie slab.  (*Id.* at 122.)

### E.  Dearborn and Liberty dispute the purpose of the revised BOD and how much of the revised BOD Dearborn proceeded with

Murray, Dearborn's designee in this case, stated that, during the 2009 state lawsuit, Dearborn submitted a revised basis of design (revised BOD) to the MDEQ for Dearborn's entire caisson project.  (Dearborn's Mot. for Summ. J., Ex. 18, Murray Aff. ¶ 2.)  Murray explained that Dearborn had "numerous reasons" for submitting the revised BOD, including the issues Dearborn was having with the caisson projects, including Contract 2.  (*Id.* ¶ 3.)  Murray also explained that the revised BOD "explored the possibility of redesigns of, or modifications to, [the caisson projects] to determine if there was a less expensive means of completing the projects for the purposes of settlement negotiations with the contractors."  (*Id.* ¶ 4.)  Murray stated that Dearborn believed that, if a less expensive means of finishing the caissons existed, there would be "an increased likelihood" that the parties could resolve the state litigation.  (*Id.* ¶ 5.)

15

Murray stated that another of the revised BOD's purposes was to move away from caisson construction and instead to use sewer separation. (Murray Aff. ¶ 6.) Given that purpose, Murray maintained that Dearborn needed to know whether MDEQ would approve an altered project. (*Id.* ¶ 8.) After submitting the revised BOD, Murray stated that Dearborn applied to MDEQ for a new NPDES permit for the concepts in the revised BOD. (*Id.* ¶ 9.)

Murray explained that the revised BOD set forth one option with respect to the then-current problems with the caisson. (Murray Aff. ¶ 10.) He stated that the revised BOD suggested that Dearborn/Posen complete the caisson at its existing depth, without going deeper into the rock. (*Id.* ¶ 10.) Finishing the project at that depth, Murray said, would have rendered the entire project less expensive and "would also serve to eliminate the problem that Posen was experiencing in completing the [c]aisson." (*Id.* ¶¶ 10-12.) But Murray offered that, if the parties modified the contract/caisson, issues could arise as to whether the caisson met water quality standards. (*Id.* ¶¶ 12-14.)

Murray maintained that, during the 2009 litigation, Dearborn and Posen engaged in settlement negotiations "based on the concept of the [c]aisson being completed to a smaller capacity," but the parties did not resolve their issues. (Murray Aff. ¶ 16.) After the 2009 litigation, Murray stated that Dearborn and Posen "resumed discussions regarding Posen completing the [c]aisson to the lower capacity as stated in the Revised BOD." (*Id.* ¶ 18.)

Murray explained that Dearborn never informed Posen that Dearborn "was waiving the requirement that Posen complete the [c]aisson to its contracted design depth or that Posen did not have to complete the work required by Contract [2]." (Murray Aff. ¶ 19.)

16

Murray added that Dearborn never ordered Posen to construct anything other than what Contract 2 required and never approved a change to that contract. (*Id.* ¶ 20.)

Liberty also characterizes Dearborn's request for a revised BOD differently. (Liberty's Resp. at 6-7.) Liberty states that Dearborn never told Posen that the reason for the revised BOD was to advance the resolution of the litigation. (*Id.*, Zapczynski Aff. ¶ 4.) Liberty maintains that Dearborn told Posen that the new design was because the engineers were concerned with issues related to lowering the water level. (*Id.* at 7, Zapczynski Aff. ¶ 4.)

Liberty states that the true purpose of the revised BOD was to provide a cheaper and easier-to-build alternative to the caisson. (Liberty's Mot. at 7, Ex. O, Murray Dep. at 158 (Murray stating that Dearborn's position was that Posen unreasonably stopped working on the caisson even when Dearborn "had moved to provide a solution that might be cheaper and easier to build[.]")). Liberty also argues that Murray testified that the revised BOD would provide "construction" and "operational" savings. (Liberty's Mot., Ex. J, Murray Dep. at 111 (Murray stating that, while giving an update to the mayor about the project and the various options Dearborn had to deal with the caisson's troubles, and how to proceed, he wanted to err on the side of maximum exposure, and explaining that option 2, the revised BOD, would provide operational and construction savings.)). And Liberty states that the revised BOD would cost approximately five million dollars less than the original BOD. (Liberty's Mot. at 7, citing Revised Basis of Design Report, Dearborn's Mot., Ex. 17.) Liberty states that significant evidence exists that Dearborn was going to abandon Contract 2's original design. (Liberty Resp. at 8.) Liberty points to an NTH consultant's testimony and the then-current Dearborn mayor's testimony.

Larry Gilbert was a consultant with NTH.  Liberty puts forth statements that Gilbert made that support the argument that Dearborn was looking to abandon Contract 2 as contemplated.  (Liberty's Resp. at 8-9.)  Gilbert stated, as Liberty points out, that he believed that Dearborn had "alternative plans in mind' regarding the caisson.  (Liberty's Mot., Ex. Y, Gilbert Dep. at 276-77.)  Gilbert also stated, as Liberty points out, that upon seeing the revised BOD at the deposition, that it "certainly would raise questions in my mind as to what is the ultimate intent here, and in fact, is there a likely change or necessary change to Contract 2." (Ex. Y, Gilbert Dep. at 249-50.)

Liberty also points to Dearborn Mayor John B. O'Reilly's letter to the MDEQ as support for its position that Dearborn had abandoned Contract 2.  (Liberty's Resp., Ex. C, O'Reilly letter.)   In this letter, Mayor O'Reilly stated that the entire CSO "cannot be constructed or completed within the basis of design proposed in 2002."  (*Id.*)  He also stated that, in March, 2009, he "halted any **new** CSO Caisson construction and began a complete re-evaluation of the entire CSO program e.g. Basis of Design, the managerial oversight and control procedures, a forensics analysis of the two projects that had failed during construction and the personnel assigned to the project."  (*Id.*) (emphasis added.)

Liberty further points to a Dearborn newspaper clipping in which Murray stated, posturing about possibilities, that Contract 2 would stop at the bedrock, which, Liberty argues, is consistent with the revised BOD, not Contract 2 as originally contemplated. (Liberty's Resp. at 9, Ex. D.)

And Liberty cites to two NTH letters in which NTH engineers take the position that Dearborn intended to adopt the revised BOD and proceed with construction under that design.  (Liberty's Resp. at 9-10, Exs. E, F.)

18

Liberty also points out that Mayor O'Reilly stated that, as early as 2009, Dearborn had hired CDM to get a new permit from MDEQ to go forward with the revised BOD, which included securing a permit for the revised BOD.  (Liberty's Resp. at 10, Liberty's Mot., Ex. X, O'Reilly Dep. at 30; Liberty's Resp., Ex. H, CDM Dep. at 168.)

**F.   Dearborn, Posen, and Liberty enter into a standstill and tolling agreement while the state litigation was pending, Dearborn and Posen accept a case evaluation award**

During the Posen litigation, on August 12, 2010, Dearborn, Posen, and Liberty entered into a Standstill and Tolling Agreement. (Dearborn's Mot., Ex. 14, Tolling Agreement.)  In the agreement, Dearborn indicated that it had approached Posen and indicated that it was considering terminating Contract 2 and pursuing claims against both Posen and Liberty "arising from Posen's alleged default in performing work under the Contract."  (*Id.* at 1.) The agreement shows that Dearborn and Posen found it in their best interests to enter into the tolling agreement with respect to Dearborn's "potential claim under the Contract rather than terminating Posen's Contract at this time[.]" (*Id.*)  Liberty expressed that it "desire[d] to investigate [Dearborn's] potential claim under the [Performance Bond] if said claim is asserted to assess its responsibility under the Bond[.]" (*Id.*)  The parties mutually agreed that Dearborn would not file any lawsuit against Liberty or terminate Posen's contract during the tolling period. (*Id.*)  The tolling period ran from August 12, 2010 to July 31, 2011, or shorter, if the parties mutually agreed. (*Id.* at 1-2.)  The parties expressed that the tolling period would not "be included in the calculation or application of any statute of limitations or repose defense, or the limitations period as stated in Paragraph 9 of the Bond . . . or under the Contract, which may be applicable to any cause of action related to the Bond or the Contract which may be brought by [Dearborn] against Liberty or Posen, and the parties

19

agree that the applicable statute of limitations period, Bond Limitation Period, and/or contractual limitations period shall be extended for a time period equal to the Tolling Period." (*Id.* at 1-2.)  The parties also stated that the agreement did not "revive any claims, right, obligations, or defenses that were waived or expired before July 15, 2010." (*Id.* at 2.)

On March 2, 2011, Dearborn and Posen accepted a case evaluation recommendation in the Posen litigation. (Liberty's Mot., Ex V, Case Evaluation Award.) The recommendation required Dearborn to pay $600,000.00 to Posen.  (*Id.*)  And the recommendation required NTH to pay Dearborn $200,000.00.  (*Id.*)

### G. Dearborn considers declaring Posen in default, the state case is dismissed, the correspondence between Dearborn and Liberty

On June 30, 2011, Dearborn notified Liberty that it was "considering declaring a Contractor Default as a result of [Posen's] failure to complete the work required by [Contract 2.]" (Am. Compl., Ex. B, June 30, 2011 letter.)  Dearborn requested that Liberty meet with it and Posen, in accordance with the Performance Bond's Paragraph 3.1.  (*Id.*) Dearborn also stated that the letter and conference-request "is not a notice of terminating the Standstill and Tolling Agreement among [Dearborn,] Posen, and Liberty[.]" (*Id.*)

On July 6, 2011, the Wayne County Circuit Court dismissed the case with prejudice pursuant to the case evaluation.  (Liberty's Mot. for Summ. J., Ex W, Case Evaluation Award.)  The order states that the "dismissal shall be deemed to dispose of all claims in the action and includes all fees, costs, and interest to the date this Order is entered."  (*Id.*)

On July 14, 2011, Liberty responded to Dearborn's June 30 letter.  (Am. Compl., Ex. C, July 14, 2011 letter.)  Liberty acknowledged the date and time for the Paragraph 3.1

conference, set for July 20, 2011.  (*Id.*)  Liberty also requested that Dearborn "enumerate and describe," Posen's alleged failures that Dearborn maintains constitutes Contractor Default.  (*Id.*)

Five days later, Dearborn responded.  (Am. Compl., Ex. D, July 19, 2011 letter.) Dearborn outlined the facts it found supported Posen's contractor default.  (*Id.*)  Dearborn described entering into Contract 2 with Posen and the problems Posen had with the caisson.  (*Id.*)  Dearborn recounted the 2009 litigation against Posen.  (*Id.*)  Dearborn concluded

> [t]he basis for [Dearborn] declaring a contractor default and for terminating Posen's right to complete the contract is very simply–Posen is in gross violation of the time requirements for completing its work and for its refusal to complete the work it contracted to perform.  The project has sat dormant for years with Posen refusing to perform its contractual duties.  As such, Posen has given [Dearborn] no choice but to assert its rights under Liberty['s] performance bond.

(*Id.*)

On July 27, 2011, the parties executed a first amendment to the standstill and tolling agreement.  (Dearborn's Mot. for Summ. J., Ex. 22, First Amendment to Tolling Agreement.)  The parties agreed to extend the tolling period from July 31, 2011 to August 22, 2011.  (*Id.*)

On August 17, 2011, Dearborn informed Posen that it was formally terminating Posen's contract.  (Am. Compl., Ex. E, August 17, 2011 Posen termination.)

On August 18, 2011, Liberty initiated this case by filing its complaint seeking a declaratory judgment.

## II.   Rule 56 motion for summary judgment standard

21

It is well established that summary judgment under Federal Rule of Civil Procedure 56 is proper when the movant "shows that there is no genuine dispute as to any material fact, and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *U.S. SEC v. Sierra Brokerage Services, Inc.*, 712 F.3d 321, 326-27 (6th Cir. 2013) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)) (quotations omitted). When reviewing the record, "the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Id.* Furthermore, the "substantive law will identify which facts are material, and summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

When considering the material facts on the record, a court must bear in mind that "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*,  477 U.S. at 252.

## III.  Analysis

### A.  The Court denies Liberty's motion for summary judgment, because, viewing the facts in a light most favorable to Dearborn, the Michigan court case between Dearborn and Posen does not preclude this lawsuit and because there is an issue of material fact as to when the contractual period of limitations began

Liberty asserts two reasons why Dearborn cannot succeed on its counterclaims. Liberty first alleges that res judicata precludes Dearborn from litigating this case's issues, as Dearborn could have raised the issues in the Posen litigation.  (Liberty's Mot. for Summ.

22

J. at 12.)  Liberty then argues that the performance bond's contractual period of limitations

has expired and that Dearborn also cannot assert its claims on that ground.  (*Id.* at 18.)

> **1. Res judicata/claim preclusion does not bar this case because the central issue in this case, whether Liberty must pay on/breached the performance bond is an issue that the parties could not have litigated in the state action**

Liberty argues that res judicata bars Dearborn from filing suit against Liberty.  The

Court disagrees, Dearborn could not have brought this suit in the Posen litigation, for no

official contractor default had occurred, Dearborn had not demanded that Liberty perform

under the performance bond, and Liberty had not yet refused payment on the performance

bond.

Federal courts apply state preclusion law to determine whether res judicata bars a

present claim.  *Langdon v. Skelding*, 11-2353, 2013 1662961, at *6, n. 4 (6th Cir. Apr. 17,

2013) (Table) (citing *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984)),

> Collateral estoppel, or issue preclusion, precludes relitigation of an issue in a subsequent, different cause of action between the same parties or their privies when the prior proceeding culminated in a valid final judgment and the issue was actually and necessarily determined in the prior proceeding.  A person is in privy to a party if, after the judgment, the person has an interest in the matter affected by the judgment through one of the parties, such as by inheritance, succession, or purchase.  In order for collateral estoppel  to apply, the same ultimate issues underlying the first action must be involved in the second action, and the parties must have had a full opportunity to litigate the ultimate issues in the first action.  Collateral estoppel is a flexible judge-made rule generally said to have three purposes: To relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication.

*Premier Ctr. of Canton, LLC v. North Am. Speciality Ins. Co.*, 297799 , 2011 WL 5964611,

at *1 (Mich.Ct.App. Nov. 29, 2011) (all citations and quotation marks omitted).[12]

     Here, the Court finds that Liberty has not shown that it has satisfied the last  element

of res judicata–"whether the matter in the second case was or could have been resolved

in the first." *Adair v. State*, 680 N.W.2d 386, 397 (Mich. 2004).  "Res judicata bars every

claim arising from the same transaction that the parties, exercising reasonable diligence,

could have raised but did not." *Id.* (citation omitted).   Michigan applies the "same

transaction" test or approach to determine whether a first suit should bar a second.  *Id.*

(citation omitted).  "The 'transaction' test provides that 'the assertion of different kinds or

theories of relief still constitutes a single cause of action if a single group of operative facts

gives rise to the assertion of relief.'" *Id.* (citation omitted.) The transactional approach is

"pragmatic." *Id.* at 398 (citation omitted).  Under the transactional approach, "a claim is

---

[1]Here, a final decision was entered in the Posen litigation. *See CAM Constr. v. Lake Edgewood Condo. Ass'n*, 640 N.W.2d 256, 260 (Mich. 2002) ("The entry of a judgment pursuant to the acceptance of a mediation evaluation is, in essence, a consent judgment.") (citation omitted).  *See also Smith v. Township of Holly*, Nos. 306406, 306758, 2013 WL 4081083 (Mich.Ct.App. Aug. 13, 2013) (quoting, "[r]es judicata applies to default judgments and consent judgments as well as to judgments derived from contested trials.") (citation omitted).  *And see Suminiski v. State Farm Mut. Auto. Ins. Co.*, 273947, 2008 WL 400686, at*2 (Mich.Ct.App. Feb. 14, 2008) (citing *Larson v. Auto-Owners Ins. Co.*, 486 N.W.2d 128 (Mich.Ct.App. 1992) ("An accepted mediation evaluation serves as a final adjudication of the claims mediated, and is therefore binding on the parties similar to a consent judgment or settlement agreement.")).

[2]"To be in privity is to be so identified in interest with another party that the first litigant represents the same legal right that the later litigant is trying to assert.  The outer limit of the doctrine traditionally requires both a 'substantial identify of interests' and a 'working functional relationship' in which the interests of the nonparty are presented and protected by the party in the litigation." *Adair v. State*, 680 N.W.2d 386, 396 (Mich. 2004) (citations omitted).  Here, the Court, for the purposes of this motion, and because the Court finds res judicata is not applicable, assumes that Liberty and Posen are privies.

viewed in 'factual terms' and considered 'coterminous with the transaction, regardless of the number of substantive theories, or variant forms of relief flowing from those theories, that may be available to the plaintiff; * * * and regardless of the variations in the evidence needed to support the theories or rights.'" *Id.* (citation omitted).

"[T]he determinative question is whether the claims in the instant case arose as part of the same transaction as did the claims in [the prior case.]" *Adair v. State*, 680 N.W.2d at 398. "Whether a factual grouping constitutes a transaction for purposes of res judicata is to be determined pragmatically, by considering whether the facts are related in time, space, origin or motivation, and whether they form a convenient trial unit[.]" *Id.* (citations, emphases, and brackets removed).

Liberty argues that Dearborn has already litigated the issue of whether Posen breached Contract 2. (Liberty's Mot. for Summ. J. at 13.) Liberty maintains that Posen's alleged breach of Contract 2 is "central to the current action." (*Id.*) Liberty explains that "the issue is whether Posen breached the Contract by not completing the Project." (*Id.*) Liberty states that Posen and Dearborn have been at an impasse for several years, "as they could not agree on whether work could proceed and, more importantly, who should pay for dewatering efforts that would be necessary before work could proceed." (*Id.*) Liberty states that the question of which party is at fault for the project's current problems is at the heart of the issue. (*Id.*) Liberty says that the issues involve whether there was a defective design or negligent construction. (*Id.*) Liberty posits that, if Dearborn or NTH is at fault, "then Posen would be excused from its failure to complete the work." (*Id.*) But "if Posen is at fault, then its failure to complete would be deemed a breach of the Contract." (*Id.*)

25

Liberty argues that Dearborn's affirmative defenses in the Posen litigation included the allegation that Posen breached Contract 2. (Liberty Mot. for Summ. J. at 14.) Liberty frames the issue of the Posen litigation as whether the Project's problems "were the result of defective or negligent construction by Posen, defective design by NTH, or changed conditions." (*Id.*) Liberty argues that, because Posen and Dearborn resolved the litigation, that they also resolved those specific issues. (*Id.*)

Liberty suggests that "[o]ne cannot determine if Posen has breached the contract by failing to timely complete the work under the Contract without determining if such failure is Posen's fault or [Dearborn/NTH's.]" (Liberty's Mot. for Summ. J. at 14.) Liberty argues that the Posen litigation "squarely" addressed the issues present and that they "cannot be relitigated now." (*Id.*)

Liberty also argues that Dearborn could have raised the breach of contract issue in the Posen litigation. (Liberty's Mot. for Summ. J. at 15.) Liberty states that, "at all times during the [Posen litigation], Posen was already in breach for failure to complete the work." (*Id.*) (emphasis removed.) Liberty points out that Dearborn knew that Posen was in breach of the Contract during the first litigation and knew that it had the right to declare a default under the Contract. (*Id.* at 16.)

Dearborn argues that this case's central issue is whether Liberty breached the performance bond by not completing the project or paying Dearborn the amount necessary to complete the project, not whether Posen breached Contract 2. (Dearborn's Resp. at 3.) Dearborn maintains that the Posen litigation did not address these issues. (*Id.*) Dearborn explains that Liberty was not a party to the Posen litigation and that Dearborn did not assert any claims against Liberty. (*Id.*) Dearborn also maintains that it did not litigate Posen's

failure to complete the project in the Posen litigation. (*Id.* at 4.) Dearborn states that the Posen litigation was for Posen's allegations relating to the increased costs and time necessary to complete the project. (*Id.*)

Dearborn also argues that its claims against Liberty were not ripe–for the claims did not even exist during the Posen litigation. (Dearborn's Resp. at 4.) Dearborn suggests that the performance bond states that Liberty's obligations to Dearborn do not arise until Dearborn terminates the contract. (*Id.*) Dearborn maintains that it did not terminate Posen's contract until September, 2011, and that Dearborn and Posen did not resolve their claims until the Michigan state court dismissed their claims with prejudice in July, 2011. (*Id.*)

Dearborn also points to the Standstill and Tolling Agreement as proof that it did not litigate whether it terminated Contract 2 with Posen in the Posen Litigation. (Dearborn Resp. at 6.) Dearborn states that the tolling agreement language "prohibited" Dearborn from terminating Contract 2 until the agreement expired, on August 22, 2011. (*Id.* at 7.) Dearborn claims that "[b]y entering into the Standstill and Tolling Agreement and agreeing not to terminate Posen's contract during the tolling period, [Dearborn,] Posen, and Liberty [] all contractually agreed that [Dearborn] was reserving the issues related to Posen's obligation to complete the Project so that they could be addressed at a later date." (*Id.*) Dearborn adds that the tolling agreement is "unequivocal evidence" that the parties understood that Dearborn had a future claim against Liberty under the performance bond. (*Id.* at 7, n. 3.) Dearborn further adds that the tolling agreement evidences that Liberty understood that the Posen litigation claims did not relate to terminating Contract 2. (*Id.*)

27

The Court agrees with Dearborn, the Posen litigation does not foreclose Dearborn from bringing a suit against Liberty now.  The Court has little doubt that what happened in the Posen litigation will be relevant to this case.  And the Court has little doubt that Dearborn may be foreclosed from disputing certain issues given the Posen litigation.  But the Court finds that the Posen litigation did not involve Liberty or the performance bond, nor did the prior litigation involve the issue of whether a contractor default occurred.  The Posen litigation sought additional funds and additional time to complete Contract 2.  The Court also finds that, in a light most favorable to Dearborn, this case's central issues, the performance bond's alleged breach, was not ripe during the pendency of the Posen litigation.  Res judicata does not bar this suit.

Nor is the Court inclined to find that res judicata bars this suit when no party has given a detailed account of what occurred in the Posen litigation, i.e., what claims the case evaluation settled.  *See Fisher v. Cornell Eng'g*, 270252, 270258, 2007 WL 3033955, at *5 (Mich.Ct.App. Oct. 18, 2007) (pointing out that "a court may take cognizance of what was discussed in the course of case evaluation for purposes of ascertaining whether those discussions led to adjudication on the merits of an issue; and finding that the trial court did not err when it consulted case evaluation summaries "to the extent necessary to ascertain whether [a claim] had in fact been adjudicated[.]") (citations omitted).

The Court additionally finds Liberty's entering into the tolling agreement telling.  While the tolling agreement preserves any claims that arose before the parties entered into the tolling agreement, the Court finds that the tolling agreement is an additional consideration that factors into the Court's finding that res judicata does not preclude this suit.

28

2.  **A genuine issue of fact exists as to whether a material breach of Contract 2 occurred, entitling Dearborn to declare a contractor default, and whether Dearborn's alleged delay in declaring a contractor default prejudiced Liberty**

Liberty also argues that summary judgment is proper based upon the contractual period of limitations in the performance bond. (Liberty's Mot. for Summ. J. at 18.) Liberty maintains that the performance bond requires Dearborn to bring suit on the bond within two years from the earliest of three separate events. (*Id.*) Liberty points out that one of these events is a "Contractor Default," which the performance bonds defines as "Failure of the Contractor, which has neither been remedied nor waived, to perform or otherwise to comply with the terms of the Contract." (*Id.*) Liberty argues that a contractor default occurred and that Dearborn had to bring suit within two years, which Liberty argues Dearborn failed to do. (*Id.*)

Liberty argues that "[t]here can be no dispute that there was a "Contractor Default" as of April 1, 2007 (when Posen failed to reach substantial compliance) or at the very latest as of May 1, 2007 (when Posed failed to reach final completion of the Project). (Liberty's Mot. at 20.) Liberty argues that the fact that neither Dearborn, NTH, nor Posen sought to extend Contract 2's dates proves that a contractor default occurred, at the latest, on May 1, 2007. (*Id.* at 20-21.) Liberty maintains, therefore, that Dearborn had to bring suit under the performance bond by May 1, 2009. (*Id.* at 21.)

Liberty argues that Dearborn did not waive Posen's failure to timely complete the project and that neither Posen nor another party had remedied the issues. (Liberty's Mot. at 21.) Given the failure to remedy or waive the time provisions, Liberty argues that Posen definitively committed a contractor default, which triggered the contractual limitations period

29

for the performance bond. (*Id.*) Liberty states that Dearborn "cannot claim that Posen's obligation to complete the Project within the required deadlines was ever waived or remedied, as that would undermine the very claim on the Performance Bond, which is predicated on Posen's failure to complete the work." (*Id.*)

Dearborn counters that Liberty has chosen the completion date in Contract 2 so as to have a convenient contractual period of limitations argument. (Dearborn's Resp. at 14.) Dearborn argues that Posen's refusal to complete the project was the relevant Contractor Default that started the performance bond's limitations period tolling. (*Id.* at 15.)

The Court finds that issues of fact exist as to whether a contractor default occurred and whether Dearborn's delay in declaring Posen in default prejudiced Liberty.

Here, the Court notes that there is first an issue of fact as to whether the 2006 blow-in and events following, including the failure to complete the caisson by the contract dates was a material breach requiring Dearborn to declare a default. Liberty, though, does not distinguish between default and breach, for the blow-in, events immediately following, and the failure to meet Contract 2's completion dates, may have been a breach of Contract 2, but those events may not have been a material breach that required Dearborn to declare a default.

> Although the terms "breach" and "default" are sometimes used interchangeably, their meanings are distinct in construction suretyship law. Not every breach of a construction contract constitutes a default sufficient to require the surety to step in and remedy it. To constitute a legal default, there must be a (1) material breach or series of material breaches (2) of such magnitude that the obligee is justified in terminating the contract. Usually the principal is unable to complete the project, leaving termination of the contract the obligee's only option.

*L&A Contracting Co. v. Southern Concrete Serv., Inc.*, 17 F.3d 106, 110 (5th Cir. 1994) (all citations omitted).   *See Will H. Hall & Son, Inc. v. Capital Indem. Corp.*, 222262, 2001 WL 685772 (Mich. Ct. App. June 15, 2001) (holding that a reasonable factfinder could find that the defendant surety received notice that the subcontractor committed a material breach, that the plaintiff principal regarded the subcontractor to have failed to meet its contractual duties, and that the plaintiff was asking the surety to perform under the terms of the bond.) (And citing *L&A Contracting Co. v. Southern Concrete Serv., Inc.*, 17 F.3d 106 (5th Cir. 1994) with approval.)

The distinction between default and breach is important:

> Serious legal consequences attend a "declaration of default", particularly in cases such as this case involving multi-million-dollar construction projects. Before a declaration of default, sureties face possible tort liability for meddling in the affairs of their principals. After a declaration of default, the relationship changes dramatically, and the surety owes immediate duties to the obligee. Given the consequences that follow a declaration of default, it is vital that the declaration be made in terms sufficiently clear, direct, and unequivocal to inform the surety that the principal has defaulted on its obligations and the surety must immediately commence performing under the terms of its bond. Sureties deprived of a clear rule for notices of default would be reluctant to enter into otherwise profitable contracts.

*L&A Contracting Co.,* 17 F.3d at 110-11 (all citations omitted).

Liberty has an extra burden in making the argument that Dearborn should have declared Posen in default earlier. In Michigan, courts are to "more strictly construe[]" surety bonds against paid sureties than gratuitous sureties. *Kilpatrick Bros. Painting v. Chippewa Hills Sch. Dist.,* 262396, 2006 WL 664210, at *5 (Mich.Ct.App. Mar. 16, 2006) (citation omitted). A surety that attempts to "cut off responsibility on the ground that its insured did not comply with a contract provision requiring notice immediately or within a reasonable time must establish actual prejudice to its position." *Id.* (stating that Michigan law applies

31

insurance contract law to cases involving sureties.).   A paid surety, therefore, "must demonstrate that it has been prejudiced before it will be released from its contract of guarantee. [sic]"  *Id.* (citation omitted).  "It is not enough that there is a deviation from the terms of the contract, but it must be a material deviation with a paid surety, and one which results in injury to it in order to release it from liability."  *Id.* (citation omitted).

Here, Liberty is a paid surety; it must therefore show that it has been prejudiced by the alleged delay of Dearborn declaring a default.  Liberty alleges that the late default prejudiced it by taking away its ability to seek monetary recourse from Posen.  Liberty has stated that Posen was financially stable in 2007 and 2008 and that, by the time Dearborn declared a default in 2011, Posen was no longer financially solvent.  The Court more fully addresses this argument below.

The Court again agrees with Dearborn–summary judgment is not appropriate given Liberty's argument that, under the performance bond, a contractor default occurred when Posen did not meet the substantial completion date or the final completion date.  Here, while Posen did not complete Contract 2 by the specified completion date, there is no indication that Posen or Dearborn considered that failure to complete the caisson by 2007 to be a material breach.  In a light most favorable to Dearborn, the Court finds that the failure to reach the date is not a material breach, given the fact that Dearborn advanced more money to Posen to resolve the contested issues and complete the caisson. The Court finds further evidence that the failure to meet Contract 2's deadline was not a material breach in that Posen filed the Posen litigation to receive the funds and time necessary to complete the caisson.  Given that Posen, in the prior litigation, represented the desire to continue work on the caisson, and the fact that the parties ultimately accepted a case

32

evaluation issue that settled the parties issues so that Posen continued to work, the Court finds that Contract 2's completion deadline was not the date on which the performance bond began to toll. Even more support exists in the fact that all the parties involved, Posen, Dearborn, and Liberty, entered into the tolling agreement, which, although not effective until July 10, 2010, expressly stated that Dearborn could not terminate Posen. While Liberty argues that the tolling agreement's limitations period had already expired by that date, the Court disagrees. By inference, and viewing the facts in a light most favorable to Dearborn, the Court finds that the tolling agreement supports Dearborn's argument–failing to adhere to Contract 2's completion date may have been a breach of Contract 2, but it was not a material breach that resulted or should have resulted in termination of Contract 2. The Court denies Liberty's motion in regards to the contractual period of limitations as well.[3]

### B. The Court denies in part and grants in part Dearborn's motion for summary judgment because there are material issues of fact whether Dearborn is entitled to a declaratory judgment and material issues of fact regarding Liberty's arguments of discharge by modification or abandonment, waiver, and damages; the Court grants Dearborn's motion with respect to discharge by impossibility

Dearborn has filed its own motion for summary judgment. It argues that it is entitled to a declaratory judgment that Liberty must perform under the performance bond and that the arguments that Liberty has asserted to escape the performance bond are baseless. Because the Court finds that there are genuine issues of material fact regarding several of

---

[3]The Court views the facts in a light most favorable to Dearborn in this section. Below, discussing Dearborn's arguments on the contractual period of limitations, the Court does the opposite, and addresses Liberty's factual arguments concerning the contractual period of limitations.

Liberty's arguments to not perform the performance bond, the Court denies Dearborn's motion for summary judgment with respect to the declaratory judgment.

### 1. There is a genuine issue of fact whether Liberty is entitled to discharge the performance bond by impairment

Both parties characterize the discharge by impairment argument in a similar fashion–both state that Liberty argues that it was prejudiced by Dearborn's waiting too long to declare a default under Contract 2, between Dearborn and Posen. (Dearborn's Mot. at 15; Liberty's Resp. at 20.)

Dearborn argues that it is entitled to summary judgment because the performance bond tells Dearborn when it may file suit against Liberty. (Dearborn's Mot. at 15.) That timing is that Dearborn must file suit within two years of Posen stopping work, Dearborn declaring a contractor default, or two years of Liberty refusing payment on the performance bond. (Dearborn's Mot. at 15, Performance Bond ¶ 9.) Dearborn asserts that it has complied with the performance bond, for it has filed suit within two years of it declaring Posen in contractor default. (Dearborn's Mot. at 15.) Dearborn also argues that Liberty cannot force it to declare a contractor default and cannot second-guess its timing of Posen's termination. (*Id.*) Dearborn maintains that Liberty cannot complain "of the very risks that it obligated itself to protect against when it took money to issue the [p]erformance [b]ond." (*Id.* at 16.) Dearborn finally asserts that Liberty cannot complain "about the length of time that passed before [Dearborn] terminated Posen," because Liberty "voluntarily" entered into the standstill and tolling agreement. (*Id.*) Dearborn points out that Liberty also voluntarily extended the tolling agreement. (*Id.*) And Dearborn further points out that the tolling agreement gave Liberty the right to terminate it with thirty days' notice. (*Id.*) This

34

right, coupled with Liberty's knowledge of Posen's deteriorating financial condition, Dearborn argues, should persuade the Court that Liberty is not entitled to discharge by impairment.  (*Id.*)

Liberty argues, pointing to the Restatement (Third) of Suretyship and Guaranty, that Dearborn's failure to declare a contractor default in 2006 or 2007 and waiting until 2011 has severely prejudiced Liberty's ability to seek recourse against the now financially defunct Posen.  (Liberty's Resp. at 20-21.)

Michigan courts do look to the Restatement (Third) of Suretyship and Guaranty for guidance when presented with surety issues.  *See  Will H. Hall & Son, Inc. v. Ace Masonry Constr., Inc.*, 677 N.W.2d 51, (Mich.Ct.App. 2003) (stating that "Michigan case law is minimal concerning sureties," but looking to the Restatement (Third) of Suretyship and Guaranty for guidance.).

Neither party cites the restatement section that is most appropriate here–§ 50.  Effect on Secondary Obligation of Obligee's Lack of Action to Enforce Underlying Obligation.  That section provides:

(1) Delay by the obligee [(Dearborn)] in taking action against the principal obligor [(Posen)] with respect to the underlying obligation, or failure of the obligee to take such action, does not discharge the secondary obligor [(Liberty)] with respect to the secondary obligation except as provided:

    (a)    by applicable statute;

    (b)    by agreement of the parties;

    (c)    in § 43 of this Restatement; or

    (d)    in subsection (2) of this section.

(2) If the failure of efforts by the obligee to obtain satisfaction of the underlying obligation is a condition of the secondary obligor's duty pursuant to the secondary

35

obligation, the secondary obligor is discharged to the extent that the obligee's
failure to act with reasonable promptness against the principal obligor is the cause
of the obligee's inability to collect from the principal obligor.

When none of (1)'s subsections applies, the Restatement gives a useful illustration:

P owes C $1,000 with S as secondary obligor.  P defaults and C conducts a
series of negotiations with P in respect of payment without modifying the
contract between C and P.  The negotiations are fruitless.  Although P was
solvent at the time of default, P becomes wholly insolvent during the period
of the delay.  S is not discharged from its secondary obligation by reason of
the delay.

Restatement (Third) of Suretyship and Guaranty § 50, illus. 2.

This section strikes at the heart of Liberty's argument–that Dearborn has prejudiced
it so significantly that Posen is now insolvent.  Following § 50, as a Michigan court would,
then, Liberty could not succeed on its argument that Posen's insolvency prejudiced it.
Case law is sparse in this area of the law.  *John T. Callahan & Sons, Inc. v. Dykeman Elec.
Co., Inc.*, 266 F.Supp.2d 208 (D.Mass. 2003), is instructive, though.  In *Callahan*, the court,
looking to case law and the Restatement (Third) of Suretyship and Guaranty, agreed with
the premise that "a material change in the underlying contract made without a surety's
consent operates as a discharge if the modification increases the surety's risk." 266
F.Supp.2d at 235.   There, the court noted the surety's argument, which parallels Liberty's
argument.  The court noted that the surety was arguing that the obligee (Dearborn, here)
delayed in declaring the principal obligor (Posen, here) in default and that delay "materially
prejudiced" the surety or "materially increased its risk under the bond," because, during the
delay, the principal obligor became insolvent.  *Id.* at 237.

The *Callahan* court held that a delay in declaring a default was not a breach of the
underlying contract or a material modification.  266 F.2d at 237.  The court looked to the

36

performance bond, which did not set a time period for the obligee (Dearborn) to declare a default. *Id.* Because the performance bond did not specify a time, the court held, the delay in declaring a default did not materially modify the underlying subcontract (which the performance bond secured). *Id.* There, the court rejected the surety's argument that it was no longer liable when the obligee failed to act and declare a default in a more timely manner when the principal obligor was no longer solvent at the time of default. The court pointed out § 50 and its illustration and held that the delay in declaring a default, even if the delay prejudiced the surety's ability to obtain reimbursement from the principal obligors, did not discharge the surety's obligations under the performance bond. *Callahan*, 266 F.Supp.2d at 238.

But the *Callahan* court did point out a provision of the performance bond that mirrors a provision in this case–a provision that requires filling suit under the bond before the expiration of two years from the date that the principal obligor (Posen) ceased working. 266 F.Supp.2d at 237, n. 43. The court discussed that the surety's argument "might merit summary judgment if [the obligee's] delay resulted in . . . a violation of this express [timing] condition." *Id.* (citing Restatement (Third) of Suretyship and Guaranty §§ 43 and 51(1)(c) (1996)).

Here, although Liberty does not devote a section of its response to the two-year performance bond period of limitations, Liberty does allude to it, and does point to testimony of its representative that work stopped on the caisson in 2006. (Liberty's Resp. at 27.) The Court finds that there are genuine issues of fact as to when Posen quit working on the caisson. Posen's president testified that Posen quit working on the caisson after the failed 2008 dewatering (but not noting the exact date). (Zapczynski Aff. ¶ 3.) Dearborn's

representative stated that Posen continued working on the caisson after the 2006 blow-in

and after the failed 2008 dewatering.  (Murray Dep. at 10, 37, 38.)  A genuine issue of fact

exists as to whether § 50 applies in this case.

Liberty argues that § 37, Impairment of Suretyship Status, relieves Liberty of its duties

under the performance bond because Dearborn, by delaying declaring a contractor default,

has prejudiced Liberty.

Section 37 provides:

(1) If the obligee acts to increase the secondary obligor's risk of loss by increasing its potential cost of performance or decreasing its potential ability to cause the principal obligor to bear the cost of performance, the secondary obligor is discharged as described in subsections (2) and (3), and the secondary obligor has a claim against the obligee as described in subsection (4).  An act that increases the secondary obligor's risk of loss by increasing its potential cost of performance or decreasing its potential ability to cause the principal obligor to bear the cost of performance is an "impairment of suretyship status."

(2) If the obligee fundamentally alters the risks imposed on the secondary obligor by:

(a)     releasing the principal obligor from a duty other than the payment of money (§39(c)(iii)); or

(b)     agreeing to a modification of the duties of the principal obligor that either amounts to a substituted contract or imposes risks on the secondary obligor fundamentally different from those imposed on the secondary olbligor prior to modification(§41(b)(I));

the secondary obligor is discharged from any unperformed portion of the secondary obligation as more fully set forth in those sections.

(3) If the obligee impairs the secondary obligor's recourse against the principal obligor by:

(a)     releasing the principal obligor from a duty to pay money (§39(c)(ii));

(b)     granting the principal obligor an extension of time for performance of its duties pursuant to the underlying obligation (§40(b));

(c)     agreeing to a modification of the duties of the principal obligor, other than a release or an extension of time, that does not amount to a substituted contract or impose risks on the secondary obligor fundamentally differently from those imposed on the secondary obligor prior to modification (§41(b)(ii));

(d)     impairing the value of an interest in collateral securing the underlying obligation (§42);

(e)     failing to institute an action before expiration of the statute of limitations governing the underlying obligation (§43); or

(f)     any other act or omission that impairs the principal obligor's duty of performance, the principal obligor's duty to reimburse, or the secondary obligor's right of restitution or subrogation (§ 44);

the secondary obligor is discharged from its duties pursuant to the secondary obligation to the extent set forth in those sections in order to prevent the impairment of recourse from causing the secondary obligor a loss[.]

Liberty argues that Dearborn's failure to terminate Posen is akin to granting Posen an extension of time, which § 38 covers. Comment b to § 38, Liberty asserts, notes that the passage of time can prejudice the surety so as to impair the surety contract.[4]   Liberty

---

[4]Restatement (Third) of Suretyship & Guaranty § 38: Preservation of Secondary Obligor's Recourse (1996).

(1)     When an obligee releases the principal obligor from, or agrees to extent the time for performance of, a duty to pay money pursuant to the underlying obligation, the release or extension effects a "preservation of secondary obligor's recourse" with respect to that duty if the express terms of the release or extension provide that:

(a)     the obligee retains the right to seek performance of the secondary obligation by the secondary obligor; and

(b)     the rights of the secondary obligor to recourse against the principal obligor . . . continue as though the release or extension has not been granted.

(2)     When the obligee effects a preservation of the secondary obligor's recourse in conjunction with a release or extension, the principal obligor's duties of performance and reimbursement and the secondary obligor's rights of restitution and subrogation continue as though the release or extension did not occur.

Comment b. Under § 37(3), the obligee's impairment of the secondary obligor's recourse generally will discharge the secondary obligor to the extent necessary to prevent loss. While preservation of recourse by the obligee lessens the risk of the secondary obligor suffering a loss as a result of impairment of recourse, it does not necessarily prevent that loss. This is the case because, in most contexts, secondary obligors do not seek to enforce their rights against principal obligors until the obligee seeks performance from the

argues that overwhelming evidence exists that Dearborn had the right to default and terminate Posen by early 2007, if not earlier. (Liberty's Resp. at 21.) The failure to default Posen earlier, Liberty argues, prejudiced Liberty because Posen now has a "significantly decreased financial status." (*Id.* at 22.)

Here, Liberty has submitted an affidavit stating that Posen is so financially destitute that Liberty is prejudiced in its ability to seek recourse from Posen. (Zapczynski Aff. ¶ 8.)

While the Court finds that Liberty's financial-recourse impairment argument is not the type of argument contemplated by the Restatement, as § 50 more appropriately fits the facts of this case, the Court has also found a genuine issue of fact as to whether § 50 applies.

The Court therefore denies Dearborn's motion with respect to the discharge by impairment argument.

### 2. There is a genuine issue of fact whether Liberty is entitled to discharge because Dearborn modified or abandoned Contract 2

---

secondary obligor. If the secondary obligor first learns of an extension or release (and the accompanying preservation of recourse) a significant time later, the passage of time may rob the secondary obligor's recourse of any practical value if the principal obligor's ability to perform has degenerated during that time. If, on the other hand, the obligee informs the secondary obligor promptly of the extension or release and the preservation of recourse, the obligee can prevent this type of loss.

Nonetheless, even when the secondary obligor is aware of both the release or extension and the preservation of recourse, loss can still occur. The release or extension may, for example, induce behavior on the part of the principal obligor that lessens the principal obligor's ability to perform. Once again, however, the obligee can minimize the likelihood of such a loss by promptly informing the secondary obligor of the release or extension and the preservation of recourse. Thus informed, the secondary obligor has an incentive to discourage behavior of the principal obligor inconsistent with its obligations to the secondary obligor.

Liberty asserts that Dearborn modified and/or abandoned Contract 2, thereby altering Contract 2 so significantly as to discharge Liberty from performance of the performance bond.

Dearborn argues that it is entitled to summary judgment on Liberty's modification/abandonment claim.  Dearborn argues that it "never ordered Posen to build anything other than what Posen contracted to build, directed Posen to do so, [n]or issued a work change directive or change work order requiring Posen to build anything other than what it was contractually required to build."  (Dearborn's Mot. at 17.)  Dearborn also asserts that there was never any agreement between it and Posen for Posen to construct anything but the caisson as contemplated by Contract 2.  (*Id.*)

### a. There is a question of fact whether Liberty should be discharged from the performance bond because Dearborn modified Contract 2

Liberty again points to the Restatement (Third) of Suretyship and Guaranty on modification to support its argument that an issue of fact exists to withstand Dearborn's motion for summary judgment.   Liberty argues that Dearborn's revised BOD and taking actions to secure CDM, a new contractor, and taking steps towards transitioning away from Contract 2 as contemplated (e.g., seeking the NPDES permit from MDEQ), create an issue of material fact as to whether Dearborn modified or abandoned Contract 2.

Section 41, Modification of Underlying Obligation, provides:

> If the principal obligor and the obligee agree to a modification, other than an extension of time or a complete or partial release, of the principal obligor's duties pursuant to the underlying obligation:
> (a)    any duty of the principal obligor to the secondary obligor of performance or reimbursement is correspondingly modified;
> (b)    the secondary obligor is discharged from any underperformed duties pursuant to the secondary obligation:

41

     (i)  if the modification creates a substituted contract or imposes risks on the secondary obligor fundamentally different from those imposed pursuant to the transaction prior to modification;

     (ii) in other cases, to the extent that modification would otherwise cause the secondary obligor a loss;

  (c)   to the extent that the secondary obligor is not discharged by operation of paragraph (b) from its duties:

     (i)  the secondary obligation is correspondingly modified;

     (ii) if the modification of the underlying obligation changes the amount of money payable thereunder, or the timing of such payment, the secondary obligor may perform the secondary obligation as though there had been no modification;

  (d)   the secondary obligor has a claim against the obligee to the extent provided in § 37(4)).

Here, evidence exists to defeat Dearborn's motion for summary judgment. Dearborn's designee, Murray, stated that Posen unreasonably stopped working on the caisson even when Dearborn was taking steps to provide a cheaper and easier solution to construct the caisson. (Liberty's Mot.; Ex. O, Murray Dep. at 158.) NTH's consultant, Larry Gilbert, testified that Dearborn sought to modify Contract 2 with the revised BOD. (Liberty's Mot., Ex. Y, Gilbert Dep. at 276-77.) He also testified that the new design would be a "significant deviation" from the original design. (*Id.* at 262.) Letters from NTH also exist in which NTH expresses the viewpoint that Dearborn intended to adopt the revised BOD and proceed with construction under that design. (Liberty's Resp., Exs. E, F.) Other letters from NTH exist, as reviewed above, that show that NTH became aware of Dearborn's intent to proceed with CDM's proposed "tremie slab work," which the revised BOD contemplated. (Liberty's Resp., Ex. J.) NTH further expressed that it believed that Dearborn had replaced NTH with CDM as the project's engineer. (*Id.*)

Finally Zapczynski, Posen's president, further maintains that, after the revised BOD, Posen and Dearborn did not discuss continuing work under the original design.

42

(Zapczynski Aff. ¶ 5.) Zapczynski also claims that Dearborn "sought work on the Project to continue under the new basis of design, but Posen refused to go forward with the new design without agreement as to how much" Dearborn would pay Posen.  (*Id.* ¶ 6.)

Liberty has also submitted a March 16, 2010 email from Murray to CDM about the entire CSO project.  (Liberty's Mot., Ex. K.)  In the email, Murray states that Dearborn and CDM needed to meet with NTH to develop a hand off strategy for the Contract 2 caisson as Dearborn moved forward with the MDEQ modified permit negotiations.  (*Id.*)

Given the evidence that supports Liberty's position that Dearborn took significant strides towards enacting the revised BOD, including securing permits and switching engineers, the Court finds that there is a genuine issue of material fact whether Dearborn sought to modify Contract 2 to the extent that it no longer resembled the contract that Liberty's performance bond secured.  But the Court notes that the modification must be a material modification, and that Liberty bears the burden to show that the modification increased its risk.  *See Callahan*, 266 F.Supp.2d 208 (citing a case for the proposition that a substitution of a party in a subcontract could create a different underlying contract/modification and therefore discharge the surety if the surety could demonstrate that the modification increased the surety's risk.)(but also noting that "[a]ny such substitution [] is a genuine issue of material fact.").  *See also Haddad v. Western Contracting Corp.*, 71 F.Supp. 212, 215 (N.D.W.Va. 1946) (stating, "[a]n alteration or modification of a construction contract without the surety's knowledge or consent will not discharge a compensated surety in the absence of material prejudice to the surety.") (citation omitted).

### b. There is a genuine issue of fact as to whether Liberty should be discharged from the performance bond because Dearborn abandoned Contract 2

Liberty also argues that summary judgment is not appropriate on its abandonment claim. (Liberty's Resp. at 24-25.) Liberty maintains that testimony and documents exist to show that Dearborn and Posen "had no intention of completing the [caisson] as originally designed." (*Id.* at 25.) Liberty states that Dearborn hired a new engineer to develop a new concept for the Contract 2 caisson, submitted that concept to MDEQ, which issued a new permit requiring construction of the new design. (*Id.*) Because Dearborn abandoned Contract 2, Liberty argues, Posen has no obligation, and therefore Liberty has no obligation, under the performance bond. (*Id.*)

The Court finds that evidence exists to withstand Dearborn's argument that summary judgment is appropriate on abandonment.

"The abandonment of a contract is a matter of intention to be ascertained from the facts and circumstances surrounding the transaction from which the abandonment is claimed to have resulted." *Asphalt Solutions Plus, LLC v. Associated Constr. of Battle Creek, Inc.*, 301136, 2011 WL 6187043, at *2 (Mich.Ct.App. Dec. 13. 2011) (citations omitted). "Abandonment of a contract "may be inferred from the conduct of the parties and the attendant circumstances. A contract will be treated as abandoned when acts of one party, inconsistent with the existence of a contract, are acquiesced in by the other party." *Id.* (citations omitted).

"A party displays intent to abandon if it 'positively and absolutely refuses to perform the conditions of the contract, such as a failure to make payments due, accompanied by other circumstances, or where by [its] conduct [it] clearly shows an intention to abandon the

44

contract.'" *Interior/Exterior Specialist Co. v. Devon Indus. Grp., LLC*, 276620, 2009 WL 49616, at *5 (Mich.Ct.App. Jan. 8, 2009) (citation omitted, insertions in *Interior*). "Abandonment must be mutual, however; if one party continues to perform under the contract after the other party exhibits its intent to abandon, there has been no abandonment." *Id.* (citations omitted) (citing a case that found "that the parties abandoned the contract because one party ordered work not contemplated in the contract and the other party 'acquiesced' by performing the non-contractual work rather than performing under the contract.") *Id.* (citation omitted).

"Whether there has been an abandonment of a contract is a question of fact to be determined by the jury." *Interior*, 2009 WL 49616, at *6 (citations omitted).

The Court finds that evidence exists, viewed in a light most favorable to Liberty, that Dearborn intended to abandon Contract 2 as designed.

Liberty states that Dearborn terminated its relationship with NTH, evidencing the fact Dearborn had decided to abandon Contract 2. (Liberty's Resp. at 12.) Liberty points to three letters NTH sent to Dearborn. (Liberty's Resp., Exs. J, E. F.) These letters, which NTH sent in February and March, 2011, show NTH's position concerning CDM's involvement in continuing the caisson project, the risks associated with CDM's plan, and the relationship status between Dearborn and NTH.

On February 18, 2011, NTH wrote to Dearborn that NTH became aware of CDM's proposed plan of "tremie slab work," a plan that aligned with the revised BOD rather than the original contract. (Liberty's Resp., Ex. J.) NTH warns Dearborn of the risks associated with the tremie slab work. (*Id.*) NTH also informs Dearborn that it is aware of the direct communications between Dearborn and  Posen, which NTH stated was contrary to the

45

Dearborn-NTH contract. (*Id.*) NTH comments that it found that Dearborn's actions were contrary to its contract with Dearborn and that NTH found that CDM had replaced it as engineer on the project. (*Id.*)

On March 8, 2011, NTH sent another letter to Dearborn. (Liberty's Resp., Ex. E.) In this letter, NTH disagrees with Dearborn's framing of Contract 2's status. (*Id.*) NTH states that Contract 2 has been dormant for two years. (*Id.*) NTH notes that it believes that Dearborn's intent is to continue the caisson construction under CDM's proposed alternate design. (*Id.*) NTH further notes that it already believes that it is no longer the engineer of record and that Dearborn has already terminated the Dearborn/NTH contract. (*Id.*)

A week later, on March 16, 2011, NTH again sent a letter to Dearborn. (Liberty's Resp., Ex. F.) NTH affirms its position–Dearborn has chosen an alternate path regarding the caisson. (*Id.*) NTH states that Dearborn is not attempting to mitigate its damages, but rather is proceeding in a new direction. (*Id.*) NTH contests Dearborn's contention that work has been performed on the site. (*Id.*) NTH states that the reading of the "geotechnical instrumentation on" Contract 2 was not work that Contract 2 required but rather "an additional service separate and distinct from the construction contract administration and engineering services performed prior to the suspension of work on these projects." (*Id.*)

Liberty also points to a March 16, 2010 email from Murray/Dearborn to CDM about the entire CSO project. (Liberty's Mot., Ex. K.) In this email, Murray states to Carl Johnson, a CDM employee, that Dearborn and CDM needed to meet with NTH to "develop a co-ordination/hand-off strategy for CSO 2, 3, and 5 as we move forward with the MDNRE modified permit negotiations and litigations [sic] issues are resolved." (*Id.*) Johnson then

46

sent an email, on March 31, 2010, to various CDM employees.  (Liberty's Resp., Ex. L.)

Johnson gives the status of the CSO project.  (*Id.*)  He notes that NTH would stay on as a

subconsultant to CDM on Contract 2, but that NTH should start handing off work to CDM

by September 30.  (*Id.*)  Johnson also notes that CDM would inherit Contract 2's legacy

design and that CDM could help to define the scope of the work.  (*Id.*)

Evidence therefore exists that Dearborn replaced NTH as the engineer on the entire

CSO project, communicated directly with Posen, and sought to enact a revised BOD with

a new engineer.  This evidence is enough to survive Dearborn's motion.  *See Asphalt*

*Solutions,* 2011 WL 6187043, at *2 (holding that a subcontractor abandoned a contract with

the project manager when the subcontractor sent proposals directly to the   prime

contractor, ignored the procedure for updating the subcontract to make additions to the

subcontract, and proposed changes to the cost of the originally contracted work.).  *See also*

*Interior*, 2009 WL 49616, at *6 (upholding a jury verdict that the parties mutually agreed to

abandon the contract when the plaintiff presented evidence that the defendant "acted

inconsistently with the terms of the contract by denying [the] plaintiff control over its means

and methods and directing it to perform in a certain manner, directing [the] plaintiff to

perform work outside the scope of the original contract, and forcing [the] plaintiff to perform

under conditions contrary to those contracted for. [The plaintiff] also demonstrated that it

acquiesced in [the defendant's] acts instead of exercising its rights to cease performance.").

Given this evidence, summary judgment is not appropriate.

### 3.  Contractual period of limitations

47

The Court has already addressed the contractual period of limitations in Liberty's motion for summary judgment.  Summary judgment is not appropriate on this argument. Viewing the facts in a light most favorable to Liberty, there is evidence that Posen performed no significant work at the caisson after the 2006 blow-in and no work after the 2008 failed dewatering.  There are issues of fact as to whether Posen performed work on Contract 2, under Contract 2, after 2006 and whether the 2009 change order and the failed subsequent dewatering efforts and maintaining the water level in the caisson could be viewed as performing work on Contract 2.

### 4.  Waiver of default and waiver of right to terminate

Dearborn argues that it is entitled to summary judgment on Liberty's claim that Dearborn waived its right to declare a default or terminate Contract 2.  (Dearborn's Mot. at 23.)

Liberty argues that Dearborn knew of its rights to default or terminate Posen and that Dearborn did nothing save for tell Posen to continue working.  (Liberty Resp. at 29.)  Liberty states that Dearborn intentionally did not terminate Contract 2 for its own litigation strategy reasons.  (*Id.* at 29-30.)

"[W]aiver is a voluntary and intentional abandonment of a known right."  *Quality Products & Concepts Co. v. Nagel Precision, Inc.*, 666 N.W.2d 251, 258 (Mich. 2003) (citations omitted).  "[W]hen a course of conduct establishes by clear and convincing evidence that a contracting party, relying on the terms of the prior contract, knowingly waived enforcement of those terms, the requirement of mutual agreement has been satisfied."  *Id.*

48

The Court finds that summary judgment is not appropriate on this claim. Given that the Court found that issues of fact exist as to whether Dearborn abandoned Contract 2, the Court finds that that finding goes hand-in-hand with a finding that issues of fact exist as to this claim as well. For if a jury finds that Dearborn abandoned Contract 2, Dearborn must have therefore abandoned the rights it had under that contract, including the right to declare a default or terminate Posen. *See Callahan*, 266 F.Supp.2d at 238 (in addressing the surety's waiver argument, holding that as long as the obligee "took action within two years of the cessation of work, the bond did not expressly require [the obligee] to act within a shorter period of time.").

### 5. Impossibility of performance

Dearborn argues that Liberty has no evidence to support the claim of impossibility. (Dearborn's Mot. at 24.) Dearborn maintains that Liberty has retained no experts to testify to this allegation and has conducted no soil stabilization studies to determine whether a contractor could complete the caisson as originally designed. (*Id.* at 24-25.) Dearborn offers NTH's consultant's opinion, who testified that Contract 2 could be completed as designed. (*Id.* at 25.)

Liberty argues that Dearborn has mischaracterized its impossibility argument. (Liberty's Mot. at 31.) Liberty argues that there is not a physical impossibility, but rather a practical impossibility due to the caisson's current circumstances. (*Id.*) Liberty states that the caisson is full of water and that the Posen litigation already determined that Dearborn was at fault for the water in the caisson. (*Id.*) Liberty also argues that Dearborn and Posen could not agree on how they would go forward with the work on Contract 2. (*Id.*) Liberty maintains that "[t]he impasse between the parties has left Posen and [Dearborn] with a

49

situation in which the Project simply cannot be completed without a determination of who was at fault." (*Id.* at 31-32.)  Liberty explains that, since a fault determination occurred in the Posen litigation, that issue "can no longer be litigated, leaving the parties without the means to go forward, and creating an impossibility." (*Id.* at 32.)  Liberty states there is a practical impossibility given the circumstances.

In its reply, Dearborn maintains that the Posen litigation solely resolved Posen's claims relating to the differing site conditions and design defects.  (Dearborn's Reply at 6.)  Dearborn maintains that, after the Posen litigation, "all of Posen's claims relative to soil stabilization were resolved, including Posen's claims for additional costs to implement soil stabilization." (*Id.*)

Liberty's argument misses the mark as much as Dearborn's characterization.  The Court grants Dearborn's motion for summary judgment, for Liberty has not brought forth any compelling arguments of facts to withstand the motion.  There are two types of impossibility in Michigan, as explained in  *Bissell v. L.W.Edison Co.*, 156 N.W.2d 623, 626 (Mich.Ct.App. Dec. 8, 1967)

> Impossibility of performance may be classified as original impossibility or supervening impossibility.  The former is impossibility of performance existing when the contract was entered into, so that the contract was to do something which from the outset was impossibly; whereas [s]upervening impossibility is that which develops some time after the inception of the contract.

*Bissell v. L.W.Edison Co.*, 156 N.W.2d 623, 626 (Mich.Ct.App. Dec. 8, 1967) (citation omitted).  *See also Alliant Tax Credit Fund 31-a, Ltd. v. Taylor 8 Assoc., LLC*, 08-12938, 2009 WL 691900 (E.D.Mich. Mar. 12, 2009) (Battani, J.) (recognizing, under Michigan law, that a "promisor's liability may be extinguished in the event his or her contractual promise becomes objectively impossible to perform.").  The *Bissel* court quoted the following:

50

the essence of the modern defense of impossibility is that the promised performance was at the making of the contract, or thereafter became, impracticable owing to some extreme or unreasonable difficulty, expense, injury, or loss involved, rather than that it is scientifically or actually impossible[.] The true distinction is not between difficulty and impossibility. . . . The important question is whether an unanticipated circumstance has made performance of the promise vitally different from what should reasonably have been within the contemplation of both parties when they entered into the contract[.]

*Id.* (citation omitted).

The Court does not find Liberty's argument compelling.  Again, the Court notes that there is no evidence from the Posen litigation expressly determined that Dearborn was at fault for the water in the caisson.  Liberty also has not supported its argument that a party can use a possible claim preclusion defense as an impossibility defense.  The Court finds that Liberty has not created an issue of fact as to this defense, the Court grants Dearborn's motion with respect to this argument.

### 6.  Summary judgment is not appropriate on Dearborn's damages request

Dearborn requests various amounts for damages.  (Dearborn's Mot. at 25.)  Dearborn states that CDM has calculated the that the cost of completing the caisson as designed is $30,450,000.  (*Id.*, Ex. 17, Revised Basis of Design, Appendix B-3.)  Dearborn states that there remains only $11,543,292.56 unspent on Contract 2.  (*Id.*)  Given that unspent amount, Dearborn maintains that Liberty must pay $18,906,707.44 to complete the caisson. In its reply, Dearborn provides another, updated damages request.  (Dearborn's Reply at 7.)  Dearborn states that it is entitled to $28,250,000.00 to complete Contract 2 and therefore requests $16,706,707.44 to complete Contract 2 (after subtracting the amount still unspent on Contract 2.).  (*Id.*)

51

Dearborn also states that the performance bond entitles it to liquidated damages. (Dearborn's Mot. at 26, Performance Bond. ¶ 6.03.)  The performance bond addresses liquidated damages:

> After Owner has terminated Contractor's right to complete the Contract, and if Surety elects to act under Paragraph 4.1, 4.2, or 4.3 above, then the responsibilities of Surety to Owner shall not be greater than those of Contractor under the Contract, and the responsibilities  of Owner to Surety shall not be greater than those of Owner under the Contract.  To a limit of the amount of the Bond, but subject to commitment by Owner of the Balance of the Contract Price to mitigation of costs and damages on the Contract, Surety is obligated without duplication for:
>
> []
>
> 6.3    Liquidated damages, or if no liquidated damages are specified in the Contract, actual damages caused by delayed performance or non-performance of Contractor.

(Performance Bond ¶ 6.03.)

Dearborn states that, pursuant to its agreement with Posen, it is entitled to $2,500.00 per day in liquidated damages from the date Posen was to have substantially completed the caisson to the date when the caisson is finished.  (Dearborn's Mot. at 26, Form Agreement, Art. 4.03A.)  Dearborn calculates the liquidated damages time period as 1,889 days, therefore Liberty owes $4,722,500.00.  (*Id.*)

Dearborn also argues that it is entitled to interest under Michigan's Unfair and Prohibited Trade Practices and Frauds Act.  (Dearborn's Mot. at 26.)

Liberty contests Dearborn's damages.  (Liberty's Resp. at 32.)  Liberty first states that Dearborn has calculated the $30 million dollar damages amount from the revised basis of design in 2010.  (*Id.*)  Liberty, though, points to a more updated, 2013 CDM estimate

52

showing that completing Contract 2 as contemplated would be $25,200,000.00. (*Id.* at 32, Ex. S.)

Liberty also contests the $25 million calculation, stating that that calculation includes ground freezing, which NTH had claimed was unnecessary to complete Contract 2 as contemplated. (Liberty's Resp. at 33, citing Liberty's Mot., Ex. J, Murray Dep at 113.)

Liberty also challenges Dearborn's request for liquidated damages. (Liberty's Resp. at 33.) Liberty argues that Dearborn asserted liquidated damages as an affirmative defense in the Posen litigation and that Dearborn cannot now request the damages. (*Id.*)

Liberty finally challenges Dearborn's request for interest under the Uniform Trade Practices Act. (Liberty's Resp. at 33.)

The Court agrees, in part, with Liberty's arguments. The Court finds that issues of facts exist as to the underlying liability in this case and whether damages are appropriate at all, so the Court finds that adjudicating an amount owing is premature. The Court also finds that Liberty has created a genuine issue of fact as to what amount of damages would be appropriate and by what means Contract 2 could be completed.

The Court declines, though, to foreclose liquidated damages based on the argument that the Posen litigation precludes them. As the Court has discussed above, the Court does not know what actual issues the parties litigated in the prior suit. Dearborn can make the argument that it is entitled to liquidated damages.

As for interest under the Uniform Trade Practices Act, the Court finds that Dearborn will be entitled to interest under the Act if Dearborn is entitled to damages. Liberty argues that Dearborn is not entitled to interest because this dispute is "reasonably in dispute."

53

Michigan Compiled Law § 500.2006 governs timely payment of benefits to an insured. Section one states that [f]ailure to pay claims on a timely basis or to pay interest on claims as provided in subsection (4) is an unfair trade practice unless the claim is reasonably in dispute." Mich.Comp.Laws § 500.2006(1).

Michigan case law, though, expressly allows first party claimants, such as Dearborn to receive interest even if the claim is reasonably in dispute. *See Hastings Mut. Ins. Co. v. Mosher Dolan Cataldo & Kelly, Inc.*, 296791, 2013 WL 1149790, at *17 (Feb. 14, 2013) ("Michigan case law has reinforced this distinction [between third-party and first-party claimants] and emphasized that first party insurance claimants need not demonstrate that the claim was "not reasonably in dispute" in order to recover the 12% interest.") (insertions in *Hastings*, citations omitted). Dearborn will be entitled to interest if it succeeds on its claim and receives an award of damages.

## IV. Conclusion

For the above-stated reasons, the Court DENIES Liberty's motion for summary judgment and GRANTS in PART and DENIES in PART Dearborn's motion for summary judgment.

So ordered.

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated: December 3, 2013

54

I hereby certify that a copy of the foregoing document was served upon counsel of record on December 3, 2013, by electronic and/or ordinary mail.

s/Johnetta M. Curry-Williams
Case Manager
Acting in the Absence of Carol A. Hemeyer